HALL (BROWN v.). See Case No. 2,008.

## Case No. 5,927.

### HALL v. The BUFFALO.

[Newb. 115.] [1]

District Court, D. Michigan. 1856.

COLLISION—SAILING AND STEAM VESSELS—COURSES OF—LIGHTS—EVIDENCE—WITNESSES ON LAND AND ON THE VESSEL.

1. The rule is well settled, that a sailing vessel must keep her course in approaching a steam vessel, and the latter must keep out of the way of the former.
[See Baker v. City of New York, Case No. 765.]

2. In collision cases, the master of the vessel whose situation is described, while standing upon the deck of his own vessel, has a more eligible situation for reliable observation, than a witness upon the approaching vessel.

3. The act of 1849 [9 Stat. 380] provides that, sailing vessels "going off large" or "before the wind," must show a white light. Under this act, a vessel "under way," with the wind "abaft the beam," must show a white light.
[Cited in The Golden Grove, 13 Fed. 691.]

4. A vessel in nautical technicality is "going off large," when the wind blows from some point "abaft the beam," is going "before the wind," when the wind is "free," comes over the stern, and the yards of the ship are braced square across.

5. Where a steam propeller was descending the river St. Clair, in a night so dark that objects could be seen but a short distance, at a speed of eight miles an hour, and had discovered below her the lights of a number of vessels; *held*, that she was in fault for not slackening her speed until she had passed.
[Cited in The Free State, Case No. 5,090.]

6. When two witnesses were examined by deposition, were subsequently examined in court, and contradicted each other, reliance is to be given to the one who is sustained by his previous testimony, rather than the other. And although the depositions were not offered by the parties, yet the court when apprised of their being on file, may call for their production.

7. In collision cases, witnesses observing passing events from different positions, cannot be expected to agree, as to locality of objects, or the relative change of position; much more must this be the case where the one making the observations is under rapid motion.

[This was a suit in admiralty by Johnson L. Hall, owner of the bark Indiana, against the propeller Buffalo, for damages caused by the collision of the Buffalo with the Indiana on the St. Clair river.]

Moore & Blackmar, for libelant.
Walker & Russell, for respondent.

WILKINS, District Judge. The libel charges a collision, between the bark Indiana and the propeller in the St. Clair river on the night of the 16th of August last. It alleges, "that the bark was sailing slowly up the river, with a fair wind after: that she kept to the right, had proper lights, was fully equipped and manned, and while thus continuing her course, using all due skill and caution, she was negligently run into and greatly damaged by the propeller: that the said propeller was descending the river and keeping to the right: that within a short distance of the bark she recklessly changed her course, and in attempting to cross the channel she collided with the bark, and caused the damage: and that, had she not changed her course, the collision would not have taken place."

The respondent has filed two answers, one on September 10th, 1855, and the other as an amendment, on the 24th of October, following. In the first, the respondent states: "That during midnight (at the time specified), the propeller was sailing slowly down the river, at the speed of eight miles an hour, with all her lights displayed: that the night was dark and without moon: and that she kept the American side of the channel: that about two miles above the place of collision, numerous vessels were observed lying in shore with proper lights, at anchor: that the propeller blew her whistle for more than a mile before the collision: and that a look-out was kept by the captain and the mate on the pilot-house: that the white light of the bark Indiana was observed on the starboard bow, apparently at anchor, a short distance above the place of collision near the American shore: that about fifteen minutes afterwards, as the propeller neared the bark and could see her canvas, it was discovered that the bark was heading diagonally across the riv-

er, and but five or six rods distant: that the respondent then hailed the bark, and inquired, whether she was under way or at anchor, and on receiving the reply, 'that she was under way,' he immediately rang his bell to stop the engine, but that it was then too late to avoid a collision: that the big anchor of the bark hanging at her side, as she came round with great violence, raked the side of the propeller, and did her considerable damage: that the propeller was proceeding at a cautious rate of speed: that she stopped her engine as soon as she discovered the bark in motion: and that the collision was caused from no omission on the part of the propeller, but because the bark did not continue headed up the stream, as manifested by her light; and because she ought not to have weighed anchor when a large steam craft was descending the river, and suddenly swing out into the stream and across the propeller's track." This narrative of the transaction, and careful consideration of the incidents which caused the misfortune, was given by the captain of the propeller on the 8th of September, about three weeks after the event. The amended answer does not vary this account in any important particular, and re-asserts the grossest want of ordinary care on the part of the bark, in displaying her white light, when she had a free wind and should have headed up, and not across the stream, when she must have known by the whistle, that a large steamer was descending.

The general rule is well settled in admiralty, that a sailing vessel must keep her course when approaching a steamer, and that the latter must keep out of the way of the former. There is but one exception, which, however, does not apply to the facts in this case as set forth by the respondent. Where the steamer, could by no exercise of diligence and watchfulness, discover the sailing vessel at a sufficient distance to avoid her, by changing her course, she is not responsible. In this case, as the answer discloses, though the night was dark, yet the light of the bark, with other similar lights, was discovered more than a mile distant, and for more than a quarter of an hour before the vessels collided. In the case of Peck v. Sanderson, 17 How. [58 U. S. 178], the steamer had no time to change her course when the Mission was discovered.

There are three allegations contained in this libel, which if sustained by the proofs, exonerate the bark from all blame, and fix the responsibility upon the steamer. They are: (1) That the bark was heading up the river with a free wind, and consequently had her proper light, indicating that she was "at large" or "before the wind"; (2) that she was properly manned; and (3) that the propeller recklessly changed her course.

As to the first and last allegations, there can be no doubt, if credit be given to the testimony of Captain Faulkner and his crew, who all testify "that the bark had taken her course up the river, and kept in that course, with a fair wind abaft the beam, with a proper white light on her pawl bit, and did not change until the collision occurred." Captain Faulkner says that when he first heard the whistle, and saw the lights of the propeller, he was under way, heading up the river. "The propeller was rapidly descending toward us, and on our larboard side, and about a mile distant." That, as she approached nearer, he gave the order to port. and the bark was kept in her course. When the propeller approached within a few rods, her captain cried out: "Are you under way, or at anchor?" and on being informed that the bark was under way, the order was given, on board the steamer, "Hard a-starboard;" in obedience to which the steamer swung across the bow of the bark and struck her about midships.

This important testimony is measurably contradicted by Captain Conkey and those of the crew of the propeller who witnessed the transaction, which discrepancy imposes upon the court the reluctant duty of discrediting one or the other. Where one witness is contradicted by another, reliance is to be given to the statement of the one above that of the other, if both having been previously examined in regard to the same matter, the one is sustained by his previous testimony, while the impeaching witness is himself thereby impeached in material points. Captain Faulkner's deposition before the commissioner corresponds with his testimony in court. Captain Conkey's is otherwise. And although these depositions were not offered during the trial, yet, on being apprised that such were on file, they were called for by the court, which avenue to the discovery of the truth is not to be closed by either a technical adherence to rule, or the omission of parties to introduce them in evidence. The testimony of Conkey is not only variant from that to which he testified on the trial, but his deposition is most glaringly inconsistent with his amended answer, and incongruous throughout. Thus he swears, that when he first saw the bark, she "was from five to ten rods off." And then subsequently states that "the bark was then heading right up stream," and that he "didn't see her change her course after that:" and that when he "first saw her sails she was lying diagonally across the river on our starboard bow:" and lastly, "when the bell was rung, the vessels were from three to five rods apart; and the collision took place ten minutes after the bell was rung, and two minutes after my last order 'to hard a-port:' and as soon as I saw her sails, I hailed her, to learn whether she was under way or not."

By the testimony of the mate, the propeller's speed was between eight and ten miles: the answer alleges the same fact; which is, evidently, grossly inconsistent with the statement that the collision took place ten minutes after the signal bell was rung; and so is

the statement as to his distance when he first saw the bark, and that she afterwards did not change her course, with his other statement that "she was lying diagonally across the river." It is obvious that if the steamer's speed was at the rate of a mile in seven minutes, and the signal bell was rung when they were but five rods off, the collision must have occurred in as many seconds as he has mentioned minutes. But, moreover, the statement of Faulkner is corroborated by his crew; while the adverse narrative of Conkey is not so sustained. Conkey swears that the bark lay diagonally across the stream. This could not have been her position if his other statement be true, that when he first saw her she was heading up the stream, and did not afterwards change her course. Now, Captain Faulkner testifies, that as the propeller approached, he saw all her lights; and this, from the time he first saw her, until the collision. In cases of this description, there will be much discrepancy in the testimony. Witnesses observing passing events from different positions, cannot be expected to agree either as to locality of objects, or relative changes of parties and things. Much more must this be the case when a rapid movement is made and making by the observing party toward the object whose true and relative position he undertakes to describe. Without the ascription of moral dereliction, a witness, under such circumstances may, with propriety, be rejected, in favor of a contrary statement, by one occupying a more eligible position for truthful observation. Captain Faulkner was better situated to state the true position of the vessel whose decks he trod, than Captain Conkey, on the propeller, approaching at the rate of eight or ten miles an hour. And Captain Faulkner's statement is self-consistent, and in accordance with the evidence of the expert testimony as to the inevitable conclusion to be drawn from the character of the collision itself.

It is alleged in the answer, that from the force of the collision, the bark being turned, her big anchor (hanging at her starboard bows) raked the entire side of the propeller. Such is the fact unquestioned. Now Conkey and his men swear that the two vessels struck each other at an angle, a little less than a right angle, and that, the speed of the propeller "slewed" the head of the bark down the stream, and consequently, if so, this anchor could not have performed this extraordinary feat, being on the side of the bark most distant from the propeller. This was evident, as well from the exhibition of the models, as from the positive testimony of Captain Ward, who testified that, if such was the position of the two vessels when they came into collision, this anchor could not have been carried away, or even touched the propeller.

Without further analysis, the court has no hesitation in declaring its judgment to be, that, as to this prominent and important fact,

the preponderance of the testimony is with the allegation of the libelant, and that the bark was heading up stream, and not diagonally across. If so, she exhibited her proper light and was not at fault. By the act of congress of 1849, steamers and sail vessels navigating the western lakes and rivers, are directed at night to exhibit certain lights, to indicate their course when under way, and when at anchor. Vessels going off large, or before the wind, or at anchor, must show a white light. There is, in nautical technicality, a difference between "going off large" and going "before the wind." "Going off large," is when the wind blows from some point abaft the beam, or over the quarter of the ship. Going "before the wind" is when the wind is free, comes over the stern, and the ship's yards are braced square across. Sailors and mariners may recognize the distinction, but the statute makes none, as the signal of the "white light" is applied to both exigencies. In this case, the bark was clearly not on her starboard tack, because the entire testimony is, that the wind was fair, up the river, and in the language of some of the witnesses, "abaft the beam." Her bow might have had a slight tendency to the shore, from the force of the current, but nevertheless, heading up stream, and therefore she displayed the right light. That the propeller recklessly changed her course, when at a dangerous proximity to the bark, appears manifest from the testimony of Captain Conkey, more minutely given in his deposition, than in court. After the propeller had approached so near as to hail the bark, and the response was given "that the bark was under way," the captain ordered his vessel "hard a-starboard" and immediately afterwards, as if in confusion, when the vessels came near, "hard a-port." Had he kept his course, the collision would not have occurred. Independent of these circumstances, which are conclusive as to where the fault is attributable, the propeller was at too great a speed in descending the river at night, when it was so dark that he could not discern objects on the deck of a vessel but a few rods off, and when, fifteen minutes before he observed a number of vessels lying at anchor. He should have slackened his speed when he first discovered the lights at the distance of a mile off. As was stated in the case of The Rose [2 Wm. Rob. Adm. 3], adopted by the supreme court, in the case of Newton v. Stebbins [10 How. (51 U. S.) 586]: "It may be a matter of convenience that steam vessels should proceed with great rapidity, but the law will not justify them in proceeding with such rapidity, if the property and lives of other persons are thereby endangered." The propeller should have cautiously felt her way, until she passed all the lights which she had discerned in the distance. By so doing, she would have ascertained the true position of the bark and have avoided the collision. The light being considered as according to the

statute, and no contest as to the competency of the officers and crew of the bark, there is no fault adjudged on the part of the libelant. As to the jurisdiction of the matter, the tonnage and ownership of the vessels being admitted, no proof is deemed necessary. The libelant was in possession, and exercised ownership. The testimony of Faulkner and Osborne is sufficient as to this objection.

The libelant being entitled, from this view of the case, to recover, yet no other damages than those actually sustained, can be allowed. Speculative damages, embracing probable profits, cannot be decreed. Upon this point, there have been variant decisions among the American courts, but as at present advised, this court will refrain to sanction such a rule, based as it is, upon what might have been, i. e. upon an uncertainty. Decree for $495.06.